NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

John GLENN,

    Plaintiff,

    v.

LAWRENCE TOWNSHIP POLICE
DEPARTMENT,

    Defendant.

Civil No. 10-3121 (AET)

**OPINION**

THOMPSON, U.S.D.J.

## I.    INTRODUCTION

This matter comes before the Court on Defendant Lawrence Township Police Department's (the "Police Department") Motion for Summary Judgment [docket #19]. Plaintiff John Glenn opposes the Motion [22]. For the reasons set forth below, the Motion will be granted in part and denied in part.

## II.    BACKGROUND

Plaintiff, who is African-American, has been a police officer in the Police Department since 1993. (Def.'s Statement of Facts ¶ 3). On or about September 22, 2005, Plaintiff took the New Jersey Department of Personnel Sergeant's Exam. (*Id*. ¶ 4). On or about January 12, 2006, the New Jersey Department of Personnel promulgated a list of eligible sergeant candidates. (*Id*. ¶ 5). Plaintiff was ranked third on the list of nine eligible candidates. (*Id*. ¶ 6). Under Civil Service Rules, Defendant was permitted to promote any of the top three scoring candidates from the test (the so-called "Rule of Three"). (Pl.'s Opp'n at 2). Despite Plaintiff "interview[ing] well," ultimately when the Police Department made promotions on August 23, 2006 and August

1

1, 2008, Defendant promoted the two other top scoring candidates (ranked first and second, respectively).  (*Id*.)  Although Plaintiff was the highest scoring candidate remaining on the eligibility list after the August 1, 2008 appointment, Plaintiff was not promoted to sergeant before the promotional list expired on January 11, 2009.  No additional appointments to the position have been made. (Def.'s Statement of Facts. ¶ 14).

On or about July 31, 2009, the Police Department purportedly received reports that Plaintiff was exhibiting paranoid behavior.  (*Id*. ¶ 15).  Among other things, officers reported that Plaintiff made statements to the effect that the Police Department was recording his conversations and that a superior officer was following him.  (*Id*.; Def.'s Ex. S; Dowers 14:18-21; 15:3-18).  Officers also reported that Plaintiff would ask them to take the batteries out of their cell phones when they were with him.  (*Id*.).  Based on these reports, two Police Department officers, Sergeant Amodio and Captain Boyd, went to Plaintiff's residence and directed that he go to the crisis center at Helen Fuld Hospital for an evaluation.  (Def.'s Statement of Facts ¶ 18).  Sergent Amodio and Captain Boyd also asked that Plaintiff hand over his Glock 22 service weapon, as well as the 11 other firearms in Plaintiff's possession.  (*Id*. ¶ 18).  Plaintiff voluntarily relinquished these weapons.

Subsequently, Plaintiff was transported to Fairmount Behavioral Health System where he was treated on an inpatient basis for two weeks.  (*Id*. ¶ 19).  On August 13, 2009, Plaintiff was released from the Fairmount Behavioral Health System and instructed to continue with out-patient treatment and his prescribed course of medication.  (*Id*. ¶ 22; *see also* Def.'s Ex. E).

Following his release, Plaintiff was directed to meet with the department psychologist Dr. Daniel Schievella.  (*See* Def.'s Ex. F).  During Plaintiff's interview with Dr. Schievella on August 28, 2009, Dr. Schievella described Glenn as "guarded and suspicious."  (*See* Def.'s Ex. G

at 6). Regarding the purpose of the evaluation Glenn reportedly stated: "I feel there is a belief that there is a desire not to have me as a sergeant because I'm the first African American to make that rank." (*Id*. at 7). Officer Glenn also indicated to Dr. Schievella his impression that he was being treated unfairly in the Police Department as a result of "certain people .... making racial jokes" and "unfair work-assignments." (*Id*.). Dr. Schievella ultimately concluded that Glenn was "presently not fit to carry either a service weapon or off-duty weapon at this time" and also found him "presently unfit for duty." (*Id*. at 15). Dr. Schievalla recommended that Plaintiff be placed on sick leave pending follow-up assessment. (*See id.*). On September 14, 2009, Plaintiff was placed on administrative sick leave. (Def.'s Statement of Facts ¶ 25).

On December 3, 2009, Plaintiff returned for a follow up interview by Dr. Schievella. (*Id*. ¶ 26). Noting that Glenn had at least superficially complied with the mandates of treatment, Dr. Schievella indicated that Plaintiff could be returned to a modified duty status without access to any weapons for three months. (*See* Def.'s Ex. H at 4). Despite Dr. Schievella's recommendation, Plaintiff was not permitted to return to work.

Four months later, in an effort to compel Defendant to allow Plaintiff to return to work, counsel for Plaintiff requested that Plaintiff be evaluated by an independent psychiatrist. (Pl.'s Opp'n at 3). Having interviewed Plaintiff and reviewed all the clinical notes by the other doctors who had evaluated Glenn as well as the investigative report prepared by the Police Department, on April 6, 2010, Dr. Charles Martinson issued a report stating that there is "no current clinical evidence of mental illness, psychosis or paranoia which would render [Plaintiff] unfit for duty as a police officer." (*Id*.; Def.'s Ex. I at 11). Additionally, Dr. Martinson opined:

> [L]et me offer my opinion in this matter. Officer Glenn is a forty-four-year-old married adult African-American male who has apparently served on the Lawrence Township Police Department with distinction for sixteen years. Officer Glenn alleges to have been passed over for promotion to sergeant some years ago. He also alleges that he was

3

> discriminated against in the department in retaliation for his discussion of "racial profiling" by law enforcement officers associated with his department. He also alleges that he was audio and video surveilled by police department equipment mounted in his patrol car and carried on his person during the course of his duties as a police officer. Finally, Officer Glenn maintains that in July, 2009 and for the second time he consulted with an attorney and expressed grievances regarding the departmental failure to promote him as well as what he suspected was department surveillance of him.
>
> The documents disclose that at this time several police officers, both within the Lawrence Township Police Department as well as those associated with other law enforcement authorities, came forward for the first time, raising allegations of Officer Glenn's paranoid preoccupation and other evidence of mental illness, suggesting that he was unfit for duty. Officer Glenn was escorted to the mental health crisis center at Helene Fuld Hospital and submitted to a period of inpatient psychiatric hospitalization thereafter.
>
> Obviously, factual issues abound in this matter and there are gross inconsistencies in the version of events provided by Officer Glenn and by police department authorities. Obviously as well, the appropriate forum for resolution of these factual inconsistencies is not a psychiatric evaluation and I do not attempt that task here.
>
> *What I do find, following my review of the records and my interview with Officer Glenn, is reasonable cause for suspicion on his part with respect to department action taken against him. I do not find that these suspicions rose to the level of "paranoia" in the sense that they were wholly removed from reality.*

(Def.'s Ex. I at 9–10 (emphasis added)). Dr. Martinson ultimately recommended that Plaintiff return as soon as possible to a "modified" duty in which Plaintiff would be on a thirty day "probationary period" basis without access to firearms during which staff would be obligated to provide the department written notice to the department regarding any evidence of Plaintiff's unfitness for duty and that Plaintiff be provided a written copy of such report and the opportunity to refute it. (*Id*. at 12). Dr. Martinson further recommended that if Plaintiff passed such a probationary period without adverse event, he should be restored to his full status with the Police Department. (*Id*.). On April 12, 2010, Plaintiff returned to work on modified duty. On May 20, 2010, Plaintiff through counsel requested reinstatement to full duty and the return of his personal weapons. (*See* Pl.'s Ex. A). In response on June 14, 2010, Defendant's counsel noted that the Police Department "continue[d] to be concerned about the psychological status of Officer Glenn"

4

and declined to restore Plaintiff to full duty, instead referring to Dr. Martinson several reports it allegedly received regarding Plaintiff's comportment during his return, none of which were previously provided to Plaintiff.  (*See* Pl.'s Exs. B, C).

On June 17, 2010, Plaintiff filed a complaint commencing this action alleging: (1) a violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq., (NJLAD) for Defendant's failure to promote Plaintiff purportedly based on his race; (2) a violation of the NJLAD for Defendant's refusal to allow Plaintiff to return to work; and (3) a violation of his constitutional rights as guaranteed by the Fourteenth Amendment and as secured by the 42 U.S.C. § 1983 based on Defendant's refusal to return Plaintiff's firearms. (*See* Compl.) [1].

On that same day Plaintiff's counsel also wrote Dr. Martinson outlining his client position with respect to Defendant's decision not to reinstate Plaintiff.  (*See* Pl.'s Ex. C).  In response to these letters, on June 23, 2010, Dr. Martinson noted:

> Apparently, the Department has chosen not to follow through with Officer Glenn's full reinstatement at this time. Whether this decision is because the Department simply disagrees with my recommendations; or, has chosen to credit the impressions of its personnel before, and after, my report rather than to credit Officer Glenn's account to me; or instead, has determined for reasons other than Officer Glenn's mental and emotional fitness that he should not be reinstated I do not know. I assume that Officer Glenn's sentiment is that this decision simply represents another example of a pattern and practice of Departmental discrimination against him.
>
> Obviously, resolution of these issues calls for a factual analysis which I am not qualified to perform and which goes far beyond the scope of my report.

(Pl.'s Ex. D at 2).  In response to Defendant's request for clarification as to his stance, on July 2, 2010, Dr. Martinson noted:

> My April 6 report to you and Mr. Rittley recommended Officer Glenn's return to work "for a brief transitional period preceding his full reinstatement" after a probationary period of 30 days.  "Full reinstatement" obviously implied return to his pre-level status including access to weapons.

5

> Officer Glenn return[sic] to modified duty on April 12 and by this timetable would have been fully reinstated to duty on May 12. This did not happen.
>
> Why this did not happen is less clear to me as I indicated in my June 23 letter to you and Mr. Sweetser. *If the Department has renewed concern about Officer Glenn's mental health fitness based on what transpired during his probationary period and you want me to re-evaluate Officer Glenn I will do so. If, instead, and for example, the Department has concern about Officer Glenn's preoccupation or distraction with the notion of his having been discriminated against by the Department even in the face of an internal investigation purportedly discrediting his allegations, the Department's decision not to reinstate Officer Glenn is not as*[sic] *issue involving Officer Glenn's mental health fitness and my further involvement is unneeded.*

(*Id*. at 3–4 (emphasis added)).

On July 19, 2010, Plaintiff was returned to full duty assignment and all weapons were returned to him. (*See* Def.'s Ex. K). Defendant now moves for summary judgment on the claims filed against it.

### III.   LEGAL STANDARD

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed. R. Civ. P. 56(c); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002) (internal quotations omitted). In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Id.* at 248–49. The Court must

6

grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Properly applied, Rule 56 will "isolate and dispose of factually unsupported claims or defenses" before those issues come to trial.  *Id.* at 323–24.

## IV.   DISCUSSION

In its Motion, Defendant contends that the Police Department should be granted summary judgment because: (1) the Police Department is not a proper defendant; (2) Plaintiff cannot establish a claim of discrimination based on race under the NJLAD; (3) Plaintiff cannot establish a claim of disability discrimination under the NJLAD; and (4) Plaintiff cannot establish a violation of his constitutional rights as Defendant has returned all of Plaintiff's firearms.  (Def.'s Br. at 2–3).  The Court will consider these arguments in turn.

A.  Police Department as a Defendant

As an initial matter in its opening brief, Defendant argues that as a matter of law summary judgment should be granted in favor of the Police Department, and the complaint dismissed because the Police Department is not an entity which can independently sue or be sued under the laws of the State of New Jersey.  (*See* Def.'s Br. at 5 (citing, *inter alia*, *Adams v. City of Camden*, 461 F.Supp.2d 263, 266 (D.N.J. 2006); *Padilla v. Twp. of Cherry Hill,* 110 Fed. Appx. 272, 278 (3d Cir. 2004)).  In response Plaintiff notes that the posture in *Adams* and *Padilla* and its progeny is decidedly different than the case at bar in that the plaintiff in *Adams* and *Padilla* sued both the municipality and the police department.  (*See* Pl.'s Opp'n. at 13); *see also Padilla*, 110 Fed. Appx. at 278 ("In Section 1983 actions, police departments cannot be sued *in conjunction with* municipalities, because the police department is merely an

7

administrative arm of the local municipality, and is not a separate judicial entity.") (internal citation omitted) (emphasis added).  On careful reading of the cases and underlying rationale, the Court agrees that *Adams* and *Padilla* do not stand for the proposition that a police department can never be the proper defendant in a 1983 action.[1]  Therefore, the Court declines to grant summary judgment on this ground.

      B.  Race Discrimination under the NJLAD

Next Defendant argues that it is entitled to summary judgment as Plaintiff cannot establish a claim of discrimination based on race under the NJLAD.  In analyzing employment discrimination claims brought pursuant to the NJLAD, courts generally apply the burden shifting analysis first proscribed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Victor v. New Jersey*, No. A-2, 2010 N.J. LEXIS 834, *47 (N.J. Sept. 13, 2010).  Under this framework, a plaintiff must first make out a prima facie case of discrimination.  However, as the New Jersey Supreme Court has cautioned:  "[t]here is no single prima facie case that applies to all employment discrimination claims"; rather, the elements vary based on the particular cause of action.  *Id.* at *48*; see also Viscik v. Fowler Equip. Co. Inc.*, 800 A.2d 826, 834 (N.J. 2002) (noting that "[t]he precise elements of a prima facie case must be tailored to the particular circumstances"); *Williams v. Pemberton Twp. Pub. Sch.*, 733 A.2d 571, 578 (N.J. Super. Ct. App. Div. 1999) ("In light of the various contexts in which employment discrimination claims arise, we consider it unwise to require a plaintiff to establish unfailingly as part of the prima facie case that plaintiff was replaced by an individual outside the plaintiff's protected class[; t]he appropriate fourth element of a plaintiff's prima facie case requires a showing that the challenged

---

[1] Indeed, the Court notes that at least one court in this District has opined that no New Jersey case law or statutory authority dictates that a plaintiff cannot sue both the municipality and the police department.  *See Tortorella v. City of Orange*, No. 02-4819, 2007 WL 151396, * 3 (D.N.J. Jan. 17, 2007) (noting that it had located a substantial number of New Jersey state court cases in which the municipality and the police department were both sued).

8

employment decision (i.e., failure to hire, failure to promote, wrongful discharge) took place under circumstances that give rise to an inference of unlawful discrimination[; t]hat formulation permits a plaintiff to satisfy the fourth element in a variety of ways.").

To establish a prima facie case for failure to promote under the NJLAD, a plaintiff generally must show: "(1) that [he] is a member of a class protected by the anti-discrimination law; (2) that [he] was qualified for the position or rank sought; (3) that [he] was denied promotion, reappointment, or tenure; and (4) that others . . . with similar or lesser qualifications achieved the rank or position." *Dixon v. Rutgers, The State Univ. of N.J.*, 541 A.2d 1046, 1051–52 (N.J.1988).

Neither party disputes that Plaintiff is a member of a protected class or that Plaintiff was qualified for the position. However, Defendant asserts that: (1) Plaintiff cannot show "adverse employment action" because only two promotions were made from the list and no other vacancies in the sergeant's position existed; and that (2) Plaintiff cannot satisfy the fourth prong because other officers not within the protected class were similarly not promoted. (Def.'s Br. at 7–16). Reviewing the evidence in the light most favorable to the Plaintiff, however, the Court disagrees. Plaintiff has presented sufficient evidence that under the Rule of Three the Police Department could consider any of the three candidates for the two openings and moreover that when the openings occurred he was considered and ultimately passed over for promotion. Therefore Plaintiff has successfully established this "modest" evidentiary burden. *See Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 508 (3d Cir. 1996).

Once a prima facie case has been presented, the burden then shifts to the defendant employer to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *See Andersen v. Exxon Co.*,

9

*U.S.A.*, 446 A.2d 486, 491 (N.J. 1982). "The defendant employer, however, only carries the burden of production, rather than persuasion, to show a legitimate, nondiscriminatory reason for its action." *Maiorino v. Schering-Plough Corp.*, 695 A.2d 353, 365 (N.J. Super. Ct. App. Div. 1997). If the employer proffers such a reason, then plaintiff must then "establish by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision." *Zive v.Stanley Roberts, Inc.*, 867 A.2d 1133, 1140 (N.J. 2005). This is satisfied if a plaintiff can show that "(1) a discriminatory reason more likely motivated the employer than the employer's proffered legitimate reason, or (2) the defendant's proffered explanation is 'unworthy of credence.'" *Maiorino*, *supra*, 695 A.2d at 365 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Defendant contends that it had a legitimate, non-discriminatory basis for selecting the other two candidates for promotion, namely that the two candidates selected were higher ranked and ultimately were found to be the better candidates at the time the promotions were made. (Def.'s Br. at 13). Additionally, Defendant maintains that it did not have another sergeant vacancy while the promotional list was valid. (*Id*. at 13). Having found that Defendant has successfully articulated a legitimate, non discriminatory reason for its decision to promote others instead of Plaintiff, Plaintiff must demonstrate by a preponderance of the evidence that the Police Department's decision was a pretext for discrimination. Here, Plaintiff offers nothing more than the fact that Plaintiff "interviewed well," that the Department originally hoped to promote a third sergeant, and that Defendant has never promoted an African-American to the position of sergeant. (Pl.'s Opp'n at 2–3).

10

The Court, however, is not in a position to displace the Police Department's personnel decisions based on Plaintiff's valuation of his interviewing prowess or his belief that the Department could afford to promote a third sergeant. An employer "has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989). With respect to Defendant's decision ultimately not to promote a third sergeant purportedly due to budget concerns, the Court "will not second-guess valid management decisions." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 527 (3d Cir. 1992); *see also Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Srvs.*, 165 F.3d 1321, 1329 (10th Cir. 1999) ("Our role is to prevent unlawful hiring practices, not to act as a super personnel department that second guesses employers' business judgments"). Moreover, the fact that Defendant has yet to promote an African-American to the position of sergeant is also insufficient to suggest that Defendant's promotional decisions are discriminatory. Because Plaintiff has failed to sustain his burden to establish pretext, the Court will grant summary judgment to Defendant as to the Plaintiff's race discrimination claim for failure to promote under the First Count.

    C.  Disability Discrimination under the NJLAD

Defendant next contends it is entitled to summary judgment on Plaintiff's disability claim under NJLAD because Defendant properly required plaintiff to submit for a fitness for duty exam prior to returning to work full duty. (Def.'s Br. at 17). Plaintiff, however, counters that his action is based, not only on Defendant's requirement that he subject himself for a fitness for duty exam, but also on Defendant's subsequent refusal to: (1) allow Plaintiff to return to work and then after it ultimately did so; and (2) its refusal to return him to full duty. (Pl.'s Opp'n at 3).

11

The NJLAD protects employees who are disabled and those perceived to be disabled from adverse employment action due to their disability. *See Andersen v. Exxon Co., USA*., 446 A.2d 486, 492 n. 2 (N.J. 1982); *Rogers v. Campbell Foundry, Co.,* 447 A.2d 589, 591 (N.J. Super. Ct. App. Div. 1982). In order to demonstrate that a plaintiff is "perceived to have" a disability, the plaintiff must show that the employer "entertain[ed] misperceptions about the [plaintiff], either believing that the individual has a substantially limiting impairment that he or she does not have or that the individual has a substantially limiting impairment when, in fact, the impairment is not as limiting as the employer believes." *Eckhaus v. Consol. Rail Corp.*, No. 00-5748, 2003 WL 23205042, at *9 (D.N.J. Dec. 24, 2003) (citing *Sutton v. United Air Lines Inc.*, 527 U.S. 471, 487 (1999)). "Even an innocent misperception based on nothing more than a simple mistake of fact as to the severity, or even the very existence, of an individual's impairment can be sufficient to satisfy the statutory definition of a perceived disability." *Dean v. Pocono Med. Ctr.*, 142 F.3d 138, 144 (3d Cir. 1998).[2]

In this case Defendant effectively concedes that although Plaintiff was cleared by Dr. Schivella to return to work on modified duty on December 3, 2010, the Chief of Police, "still had significant concerns about [Plaintiff's] behavior and returning him," and therefore barred Plaintiff's return. (Def.'s Br. at 23). However, there is sufficient disagreement between the parties as to the underlying facts regarding this decision. For example the parties appear to dispute whether Defendant could have accommodated Plaintiff or whether Defendant affirmatively required that Plaintiff receive a second opinion or otherwise explained its position.

---

[2] Although these cases were analyzed under the American with Disabilities Act, 42 U.S.C. § 12132 *et seq*. (ADA), the Court finds them instructive as the NJLAD relies on the same analytical framework as does the federal act. *See McNemar v. Disney Store, Inc.*, 91 F.3d 610 (3d. Cir. 1996); *see also Shaner v. Horizon Bancorp.*, 561 A.2d 1130, 1132 (N.J. 1989) (noting that NJLAD standards have been influenced markedly by the experience derived from litigation under federal anti-discrimination statutes). Consequently, the Court will also refer to principles prescribed in ADA cases in its analysis of Plaintiff's claim.

Additionally, Plaintiff contends that even when he was reinstated, Defendant ignored Dr. Martinson's express opinion and direction in his April 6, 2010 letter that Plaintiff be restored to full duty 30 days after his return.

"If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability." *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 784 (8th Cir. 2006).  However, where a restriction is not reasonably arrived at nor based upon supportable and reputable medical advice, it may rise to the level of impermissible discrimination.  *See also Andersen*, 446 A.2d at 486 (noting that "[p]rejudice in the sense of a judgment or opinion formed before the facts are known is the fountainhead of discrimination engulfing medical disabilities which prove on examination to be unrelated to job performance or to be non-existent.") (citation omitted).

Based on these material questions of fact, the Court must deny summary judgment as to whether Defendant's initial refusal to allow Plaintiff to return to duty and subsequent failure to restore Plaintiff to full duty within the time prescribed violated Plaintiffs rights under the NJLAD.  Therefore, the Court will deny summary judgment as to the Second Count.

D.  Unlawful Taking under Section 1983

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Hill v. Borough of Kutztown*, 455 F .3d 225, 233 n. 8 (3d Cir. 2006); (quoting *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist*., 422 F.3d 141, 146 (3d Cir. 2005); *see* 42 U.S.C. § 1983.  "In order to state a claim under § 1983, a plaintiff must allege that his constitutional rights were violated by someone acting under color of state law." *Jerrytone v. Musto*, 167 Fed. Appx. 295, 300 (3d Cir.2006) (citing *West v. Atkins*, 487 U.S. 42,

13

48 (1988)). "Accordingly, '[t]he first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'" *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir.2006) (quoting *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998))).

Plaintiff argues that Defendant's confiscation of Plaintiff's firearms and its subsequent failure to return them in a timely fashion without due process violated the Fifth Amendment's Taking Clause as incorporated by the Fourteenth Amendment. (Pl.'s Opp'n at 11). Defendant concedes that in connection with its fitness for duty evaluation into Plaintiff's mental health, the Police Department obtained from Plaintiff's residence, his Glock 22 service weapon, as well as the 11 other firearms, (*see* Def.'s Ex. D), and that these weapons remained in the Police Department's possession until Plaintiff was cleared for full duty on July 19, 2010. Defendant, however, maintains that its actions were appropriate given its duty to ensure the Plaintiff's safety and the public's safety by securing his weapons while his physical and mental well-being were being evaluated.

When a plaintiff sues under § 1983 alleging an actor's failure to provide procedural due process, there is a two-part analysis: "(1) whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property; and (2) whether the procedures available provided the plaintiff with due process of law." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (internal quotations omitted). This analysis requires a plaintiff to have "taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Id.*

14

Here, there can be little doubt that Plaintiff's personal firearms fit within the meaning of property. *See Parratt v. Taylor*, 451 U.S. 527, 537-37 (1981) (holding that a prisoner's personal hobby kit was protected property under the Due Process Clause of the Fourteenth Amendment). However, the Court notes that Plaintiff was not asked to permanently surrender his ownership rights in his personal handguns. He was asked only to cede temporary possession pending the results of the fitness for duty evaluation. When Plaintiff was eventually restored to full duty, his weapons were returned to him. The Court has serious reservations as to whether the temporal deprivation of Plaintiff's firearms pending a mental health evaluation rises to the level of constitutional violation, particularly given the significant supervisory responsibilities police departments have for officers given the nature of their employment and the frequency and potential volatility of their contact with the public. *See also Maslow v. Atlantic City*, No. 08–3618, 2011 WL 4859286, at *5 ("In these circumstances, where a superior officer orders an inferior officer to temporarily relinquish his personal firearms during the pendency of a mental disability, and the inferior officer does not challenge that order, there is no Second Amendment violation").

However, even assuming, arguendo, that Plaintiff's rights were violated by this temporary deprivation, the Court notes that it would appear that Plaintiff has waived any right to redress on this ground. *See id*. (granting summary judgment where plaintiff had relinquished his personal firearms as directed by a superior officer). As in *Maslow* Plaintiff did not contest the initial order to turn over his weapons or subsequently demand an administrative hearing or file a grievance before bringing this lawsuit. Accordingly, Defendant's Motion for Summary Judgment with respect to the § 1983 claim based on an alleged violation of the Due Process Clause under Count Three will be granted.

IV.     CONCLUSION

For the reasons stated above, and for good cause shown, the Defendant's Motion for Summary Judgment is granted in part and denied in part.  An appropriate order will follow.


 /s/ Anne E. Thompson
ANNE E. THOMPSON, U.S.D.J.


Dated March 19, 2012